IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| JAMIE WAZELLE; TAY AUNG; ELIZABETH CASEL; MANIVANH CHANTHANAKHONE; MANUEL CONTRERAS; REBECA CORRAL; PATRICIA COSSEY; JOZETTE ESCOTO; CRUZ GARCIA, SR.; SHERYL GARDNER; DENETRIA GONZALEZ; RENE GUTIERREZ; BRIAN HALL; BRANDON IVORY; NINI AYE KAYAHPHU; KO LATT; ARMANDO LIRA; DERESTIA LIRA; MYA LIRA; VALARIE LIRA; AUNG MOE; BIAK MORRIS; MALEAK RECTOR; MARICELA RIOS; NATASHA RIOS; GUADALUPE RONDAN; MIGUEL RONDAN; JAVIER RUBIO; IGNACIO RUIZ; SYLVIA RUIZ; MITCHELL SANCHEZ; BILLY SHAW; KYAW SOE; NYEIN SOE; THIDA SOE; BREANA SOLIS; LADONNA TRULL; AND TIN SOE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MAUNG MAUNG TAR, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | NO. 2:20-CV-00203-Z<br><br>JURY DEMANDED |
| Plaintiffs, | | |
| vs. | | |
| TYSON FOODS, INC.; ERNESTO SANCHEZ; KEVIN KINIKIN; and FARREN FERNANDEZ, | | |
| Defendants. | | |

## DEFENDANTS' JOINT NOTICE OF REMOVAL

Defendants Tyson Foods, Inc. ("Tyson"), Ernesto Sanchez, Kevin Kinikin, and

Farren Fernandez (collectively, "Defendants") jointly remove the matter styled

"*Jamie Wazelle, et al. v. Tyson Foods, Inc., et al.*," Cause No. 109874-C-CV, from the 251st Judicial District Court of Potter County, Texas, to this Court under 28 U.S.C. §§ 1331, 1441, 1442, and 1446. This Court has subject matter jurisdiction, and the case is removable because:

(1)   Plaintiffs' First Amended Petition ("Petition") challenges actions taken by Defendants at the direction of a federal officer, for which Defendants will have a colorable federal defense (28 U.S.C. § 1442(a)(1)); and

(2)   The Petition raises substantial and disputed issues of federal law under the Defense Production Act that must be decided by a federal forum (28 U.S.C. § 1331(a)(1)).

Removal is timely. Tyson has not yet been served, and this Notice is being filed within 30 days of service on the remaining Defendants. *See* 28 U.S.C. § 1446(b)(1); *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999); *Bd. of Regents of Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp.*, 478 F.3d 274, 278 (5th Cir. 2007); *Novak v. Bank of N.Y. Mellon Tr. Co., NA.*, 783 F.3d 910, 914 (1st Cir. 2015) (holding that "formal service is not generally required before a defendant may file a notice of removal") (collecting cases).

Defendants provide the following short and plain statement of the grounds for removal:

### BACKGROUND

The United States continues to struggle with a global pandemic whose size and scope are without modern precedent. Millions have been infected with the novel coronavirus, and more than 180,000 Americans have died of COVID-19. The economic fallout and human suffering resulting from the pandemic have been severe. This matter is brought by forty-one Plaintiffs. Forty of the Plaintiffs allege they contracted COVID-19 while at work at a Tyson meat-processing facility and suffered injury as a result. In addition, one Plaintiff sues individually and as the personal representative

of Maung Maung Tar—an individual who is alleged to have passed away, presumably from the disease. That death, and the harm caused to the thousands of individuals who have contracted COVID-19, is tragic.

But Plaintiffs' allegations here—including allegations that three Tyson manager Defendants engaged in willful misconduct—are inaccurate and incorrect. Tyson and its dedicated managers have worked hard from the earliest days of the pandemic to follow federal workplace guidelines, and Tyson has invested millions of dollars to provide employees with safety and risk-mitigation equipment. Tyson's efforts to protect its workers while continuing to supply Americans with food in the face of the pandemic continue to this day.

Removal is proper because federal court is the correct forum for resolving Plaintiffs' claims. Plaintiffs allege that Defendants failed to safely operate Tyson's facility in Amarillo, Texas during the COVID-19 pandemic. But that facility was operating pursuant to the President of the United States' authority to order continued food production and under the direct supervision of the U.S. Secretary of Agriculture. As the President emphasized, "[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans," and any "closures [of such facilities] threaten the continued functioning of the national meat and poultry supply chain" and "undermin[e] critical infrastructure during the national emergency." *Executive Order on Delegating Authority Under the DPA with Respect to Food Supply Chain Resources during the National Emergency Caused by the Outbreak of COVID-19* ("*Food Supply Chain Resources*"), 85 Fed. Reg. 26,313, 26,313, 2020 WL 2060381, at *1 (Apr. 28, 2020).[1] The President and the U.S. Secretary of Agriculture provided

---

[1] https://www.whitehouse.gov/presidential-actions/executive-order-delegating-authority-dpa-respect-food-supply-chain-resources-national-emergency-caused-outbreak-covid-19/.

detailed instruction for meat-processing facilities to continue operating, incorporating industry-specific guidance from the Centers for Disease Control and Prevention ("CDC") and the Occupational Safety and Health Administration ("OSHA").

Because Defendants were under a Presidential order to continue operations pursuant to the supervision of the federal government and pursuant to federal guidelines and directives, including directives from the Secretary of Agriculture and guidance from the CDC and OSHA, federal court is the proper forum for resolving this case.

## ARGUMENT

### I.    Federal officer removal is proper under 28 U.S.C. § 1442(a)(1).

Under 28 U.S.C. § 1442(a)(1), a civil action may be removed to federal court if the action is asserted against a person acting under the direction of a federal officer:

> A civil action . . . that is against *or directed to* any of the following may be removed . . . :
>
> (1) The United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . .

28 U.S.C. § 1442(a)(1) (emphases added).

Here, federal officer removal is proper because (1) each Defendant "is a 'person' within the meaning of the statute," (2) Defendants have "acted pursuant to a federal officer's directions," (3) "the charged conduct is connected or associated with an act pursuant to a federal officer's directions[,]" and (4) Defendants have "asserted a colorable federal defense[.]" *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020) (en banc).

**Defendants are "persons."** Section 1442(a)(1) applies to "private persons," *Bell v. Thornburg*, 743 F.3d 84, 89 (5th Cir. 2014) (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 143 (2007)), and corporations, *see Latiolais*, 951 F.3d at 291.

**Federal Direction**. On March 13, 2020, the President declared "a National Emergency in response to the COVID-19 outbreak." Exec. Office of Pres., *Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337, 15,337, 2020 WL 1227639 (Mar. 18, 2020). Soon after, on March 16, the President issued "Coronavirus Guidelines" emphasizing that employees in "critical infrastructure industr[ies]"—including employees for companies like Tyson that are essential to maintaining food-supply chains and ensuring the continued health and safety of all Americans—have a "special responsibility to maintain [their] normal work schedule." Exec. Office of Pres., *The President's Coronavirus Guidelines for America* at 2 (Mar. 16, 2020).[2] On March 25, President Trump approved a major disaster declaration for the State of Texas in response to the COVID-19 outbreak. Exec. Office of Pres., *President Donald J. Trump Approves Texas Disaster Declaration* (Mar. 25, 2020).[3]

On April 28, consistent with the directions in March and because of attempts by localities to countermand federal directions, President Trump issued an executive order. This time expressly invoking his authority under the Defense Production Act ("DPA"), 50 U.S.C. §§ 4501 *et seq.*, the President again instructed Tyson and other meat and poultry processing companies to stay open and continue operations, subject to the supervision of the Secretary of Agriculture. *See Food Supply Chain Resources*,

---

[2] https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_ coronavirus-guidance_8.5x11_315PM.pdf.

[3] https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-texas-disaster-declaration-6/.

85 Fed. Reg. at 26,313, 2020 WL 2060381, at *1. The executive order states in relevant part:

> It is important that processors of beef, pork, and poultry ("meat and poultry") in the food supply chain **continue operating and fulfilling orders** to ensure a continued supply of protein for Americans. [R]ecent actions in some States have led to the complete closure of some large processing facilities.
>
> \*      \*      \*
>
> Such closures **threaten the continued functioning** of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency.
>
> \*      \*      \*
>
> [T]he Secretary of Agriculture shall take all appropriate action . . . to **ensure that meat and poultry processors continue operations** consistent with the guidance for their operations jointly issued by the CDC and OSHA.

*Id.* (emphases added).

Consistent with the *Food Supply Chain Resources* executive order, the U.S. Secretary of Agriculture Sonny Perdue then promptly issued two letters: one to meat and poultry processors directing them how to proceed, and one to state and local officials across the nation informing them of the Secretary's actions and their obligation to work with the Secretary to ensure meat processing companies' compliance with the Secretary's directives. *See* U.S. Dep't of Agriculture, Press Release No. 0243.20 (May 6, 2020) (announcing that the Secretary had issued a "Letter to Governors" and "Letter to Stakeholders"). Secretary Perdue's Letter to Stakeholders emphasized that the "Nation's meat and poultry processing facilities and workers play an integral role in the continuity of our food supply chain." U.S.

Dep't of Agriculture, Letter to Stakeholders (May 5, 2020).[4] And, relevant here, Secretary Perdue's Letter to Governors states:

> Effective immediately, **I have directed meat and poultry processors to utilize the guidance** issued on Sunday, April 26, 2020, by CDC and OSHA specific to the meat and poultry processing industry to implement practices and protocols for staying operational or resuming operations while safeguarding the health of the workers and the community.
>
> \*     \*     \*
>
> The U.S. Department of Agriculture (USDA) has also **directed meat and poultry processing plants** currently closed and without a clear timetable for near-term reopening to submit to USDA written documentation of their protocol, developed based on the CDC/OSHA guidance, and **resume operations as soon as they are able** after implementing the CDC/OSHA guidance for the protection of workers.

U.S. Dep't of Agriculture, Letter to Governors (May 5, 2020) (emphases added)[5]; *see also* U.S. Dep't of Agriculture, Letter to Stakeholders (May 5, 2020).

The U.S. Department of Agriculture also entered into a Memorandum of Understanding with the U.S. Food and Drug Administration ("FDA") setting forth the respective roles of each agency in utilizing the DPA to regulate food producers during the COVID-19 outbreak. *See Memorandum of Understanding Between FDA and USDA Regarding the Potential Use of the Defense Production Act with Regard to FDA-Regulated Food During the COVID-19 Pandemic* (May 18, 2020).[6] Notably, the agreement reiterated that "actions by States or localities could lead to the closure of food resource facilities"; such closures "could threaten the continued functioning of the national food supply chain, undermining critical infrastructure during the national emergency"; and the Department of Agriculture retained "*exclusive*

---

[4] https://www.usda.gov/sites/default/files/documents/stakeholder-letters-covid.pdf.
[5] https://www.usda.gov/sites/default/files/documents/governor-letters-covid.pdf.
[6] https://www.usda.gov/sites/default/files/documents/mou-between-fda-usda-dpa.pdf.

*delegated authority*" under the DPA to issue orders regarding domestic food producers. *Id.* at 1–2, 4 (emphasis added).

Accordingly, Tyson's facilities—including the Amarillo facility—were operating as critical infrastructure of the United States that had been instructed by the President to continue operations both before and after the *Food Supply Chain Resources* executive order and the Secretary of Agriculture's related orders. Tyson and the three named managers—who "were directly responsible for implementing and enforcing [the] safety measures" mandated by the President and Secretary of Agriculture (Petition ¶ 55)—were "acting under the direction of a federal officer," 28 U.S.C. § 1442(a)(1), and "helping the Government to produce an item that it needs" for the national defense under the DPA, *Watson*, 551 U.S. at 153 (2007); *see also Camacho* v. *Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486-87 (1st Cir. 1989) (holding that "the reach of section 1442(a)(1) extends to private persons . . . who act under the direction of federal officers," including parties ordered to "facilitate" or "offe[r] technical assistance" to federal agents exercising statutory authority).

Consistent with the finding of proper federal officer removal in *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998), the federal government here (1) provided "detailed specifications" governing Tyson's ongoing operations—through the President's direction that the CDC and OSHA guidelines would govern those operations, and promulgation of exceedingly detailed guidelines specific to meat and poultry processors by the CDC and OSHA—and (2) exercised "ongoing supervision" of those operations through the Secretary of Agriculture, who was delegated power by the President to "take all appropriate action . . . to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." 85 Fed. Reg. at 26,313, 2020 WL 2060381, at *1.

The Petition challenges Defendants' decision to continue allowing employees to work at the Amarillo facility and the various measures that were taken at the facility. (*See, e.g.*, Petition ¶¶ 53 ("Despite [Texas's] stay-at-home order, Plaintiffs were required to continue working at the Tyson meatpacking plant in Amarillo, Texas[.]"), 60 (alleging that Defendants "[f]ailed to provide adequate PPE," "implement adequate precautions," and "follow guidelines set forth by the WHO and CDC")) But those alleged actions were taken pursuant to the authority, orders, detailed regulation, and supervision of the President and Secretary of Agriculture under the DPA. Defendants were therefore "acting under" federal officers, and are therefore entitled to have this case heard in federal court. 28 U.S.C. § 1442(a)(1).

**Connection or Association**. There is a direct connection between the Petition's allegations and the actions Defendants took at the direction of the President and Secretary of Agriculture. The Petition alleges that Defendants are liable in tort for "Tyson's conduct" (Petition ¶ 58) in adopting or allegedly failing to adopt specific measures in response to the coronavirus. (*See, e.g.*, *id.* ¶¶ 54–55, 60(a)–(i))But the measures that Defendants took were implemented at the express direction of federal officers. And any dispute about the scope of Tyson's authority to implement those measures under the federal directives "is one for the federal—not state—courts to answer." *Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (federal courts must resolve "whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government") (citing *Willingham* v. *Morgan*, 395 U.S. 402, 409 (1969)). Likewise, the Petition challenges Defendants' decision to continue allowing employees to work and implicitly challenges Tyson's decision to continue operating the Amarillo facility *at all*, (¶¶ 53–54, 60(b)), even though federal officers directed Tyson to continue operations and emphasized that meat-processing "facilities and workers play an integral role in the continuity of our food supply chain." U.S. Dep't of Agriculture, Letter to Stakeholders

(May 5, 2020). Thus, the Petition's allegations are "connected or associated with" Defendants' actions taken "pursuant to a federal officer's directions." *Latiolais*, 951 F.3d at 296.

**Colorable Federal Defenses**. Defendants have at least the following federal defenses to the claims in the Petition.

- **Express preemption under the Federal Meat Inspection Act ("FMIA").** The FMIA's express preemption clause preempts state-law requirements that are "in addition to" or "different from" the rigorous and extensive federal requirements under the FMIA. *See* 21 U.S.C. § 678; *see also, e.g.*, 9 C.F.R. § 416.5(c) (setting federal requirements under the FMIA regarding cleanliness, protective attire, and "disease control"). As construed by the Supreme Court, "[t]he FMIA's preemption clause sweeps widely" and "prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act." *Nat'l Meat Ass'n* v. *Harris*, 565 U.S. 452, 459-60 (2012). Plaintiffs here would use state tort law to impose additional and different requirements.

- **Preemption under the DPA and the Executive Order.** Plaintiffs' claims are also preempted by the DPA and the President's *Food Supply Chain Resources* executive order and related federal directions. Congress enacted the DPA to preserve "the security of the United States" by ensuring "the ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to . . . natural or man-caused disasters." 50 U.S.C. § 4502(a)(1). The DPA grants the President wide latitude to "take appropriate steps" to maintain and enhance the "domestic critical infrastructure" threatened by "emergency conditions." *Id.* §§ 4502(a)(2)(C), (4). This broad grant of authority preempts any attempt by a state to impose its own regulations on "domestic critical infrastructure" industries when the President has done so under the DPA, 50 U.S.C. § 4502(a)(2)(C); *see also Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363,

376 (2000), and provides defenses against suits like this for actions taken in compliance with orders issued under the DPA. The Petition here seeks to impose state regulation that conflicts with the President's express directives under the DPA requiring Defendants to assist the nation during a national disaster by (1) continuing to operate (2) pursuant to federal operational requirements.

## II.   The Court also has federal question jurisdiction.

This case is properly removed under 28 U.S.C. § 1331 because it "aris[es] under" federal law. *See Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 721 (5th Cir. 2017). Although Plaintiffs' causes of action are styled as state-law claims, this Court has federal question jurisdiction because the claims (1) "necessarily" raise an issue of federal law that is (2) "actually disputed" and (3) "substantial," (4) "which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc.* v. *Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *see also Wullschleger v. Royal Canin U.S.A., Inc.*, 953 F.3d 519, 521 (8th Cir. 2020) (removal proper where claim pleaded under state law "implicat[es] a disputed and substantial federal issue").

**Federal issues are necessarily raised.** The Petition necessarily raises multiple, substantial federal issues. The entire thrust of the Petition is that Defendants should not have complied with express federal directives related to the national defense—*i.e.*, should have stopped employees from continuing to work at the facility (*see* Petition ¶¶ 53, 60(b)); should have taken more or different measures than were mandated by the federal directives (*e.g.*, *id.* ¶¶ 54–55, 60(c)–(d), (f)–(i)); or failed to comply with federal law by allegedly failing to take certain precautions (*e.g.*, *id.* ¶ 60(e)). None of these claims can "be resolved without a determination" and "construction of [the] federal law[s]" under which Defendants were operating. *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E.*, 850 F.3d at 723. To the contrary, these

federal issues are plainly and necessarily raised by the Petition (*e.g.*, ¶ 60(e) (alleging Tyson "[f]ailed to follow guidelines set forth by the . . . CDC")), and they permeate every aspect of Plaintiffs' claims—from the equipment Tyson allegedly provided (*e.g.*, *id.* ¶¶ 60(c)–(e) (challenging Tyson's provision of PPE, implementation of social distancing, and failure to follow CDC guidelines)), to Tyson's continued operation despite local authorities imposing a stay-at-home order (*e.g.*, *id.* ¶¶ 53 (challenging Tyson's alleged requirement that Plaintiffs "continue working" "[d]espite the [Texas] stay-at-home order"), 60(b) (alleging that "it was no longer safe" to work at the facility)).

It "would be impossible to determine whether [Defendants] breached" a duty to Plaintiffs "without deciding whether [Defendants'] actions were governed by a valid" directive from the federal government. *Hughes v. Chevron Phillips Chem. Co. LP*, 478 F. App'x 167, 170 (5th Cir. 2012). Having elected to employ federal law "as the basis for [state] tort liability[,]" Plaintiffs cannot avoid this Court's jurisdiction. *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E.*, 850 F.3d at 723.

Although Plaintiffs have "tried to frame [their] claims as sounding only in state law," (*e.g.*, Petition ¶ 5 (asserting that "this case is not removable because Plaintiffs have not made any federal claims")), Plaintiffs "may not defeat removal by omitting to plead necessary federal questions in the complaint." *Hughes*, 478 F. App'x at 171 (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 22 (1983)). Plaintiffs' studious avoidance of explicit reference to federal law is irrelevant because "any judicial consideration of [Plaintiffs'] claims necessarily implicates substantial questions of federal law." *Id.*

**The federal issues are "substantial."** The Petition implicates federal imperatives of the highest and broadest importance: coordination of national disaster relief and the maintenance of infrastructure "essential to the national defense." 50 U.S.C. § 4511(b); *see also Scrogin* v. *Rolls-Royce Corp.*, No. 3:10cv442 (WWE), 2010

WL 3547706, at *3 (D. Conn. Aug. 16, 2010) ("[P]laintiffs' state tort claims give rise to serious federal interests in the government procurement contract and military operations."); *McMahon* v. *Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1201–02 (M.D. Fla. 2006) (holding that "the federal issues [were] quite substantial" where national defense and procurement were implicated).

Moreover, "the validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal . . . scheme is in fact subject to implicit restraints that are created by state law." *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E.*, 850 F.3d at 724. The "implications for the federal regulatory scheme" of such liability— particularly where the federal scheme relates to critical infrastructure during a national emergency—"would be significant[.]" *See id.*; *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 441 (5th Cir.), *cert. denied*, 140 S. Ct. 110, 205 L. Ed. 2d 25 (2019) (noting that the substantiality requirement is satisfied where a case "put[s] the legality of a federal action in question, in a manner that would have broader ramifications for the legal system"). Thus, there is a "serious federal interest in claiming the advantages thought to be inherent in a federal forum" for these claims. *Grable*, 545 U.S. at 313; *see also Rose* v. *SLM Fin. Corp.*, Civil Action No. 3:05CV445, 2007 WL 674319, at *4 (W.D.N.C. Feb. 28, 2007) ("Where a federal regulatory scheme requires private parties to undertake certain actions in order to comply with the law, the federal courts necessarily have a serious interest in examining the scope of liability that might arise as a result.").

**Actual dispute.** The federal interests are also actually disputed. *See Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E.*, 850 F.3d at 723 (finding federal issues actually in dispute where the parties disagreed as to whether the defendants complied with federal law). The Petition seeks to impose state-law liability on Defendants for actions taken pursuant to federal statutes and orders, and the Petition's overarching theory is that Defendants allegedly failed to comply with

federal guidance in some respects and should have exceeded (or otherwise deviated from) federal guidance in other respects. These issues—what was required under the *federal* orders and whether states can override the *federal* orders—constitute the central dispute in this case.

**Balance of responsibilities.** Finally, exercising jurisdiction over this case will not disturb—and, in fact, will preserve—the congressionally approved balance of federal and state judicial responsibilities. As explained above, through the DPA, Congress delegated to the President "an array of authorities" to "take appropriate steps to maintain" critical infrastructure—because the "national defense" and "security of the United States" depend upon it. 50 U.S.C. §§ 4502(a)(1), (4). Accordingly, there is a "clear interest" in "the availability of a federal forum" for this case, which directly challenges the President's orders under the DPA. *Grable*, 545 U.S. at 319; *see also Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E.*, 850 F.3d at 725 (holding that jurisdiction was appropriate because "the scope and limitations" of a federal framework were at stake, and deciding "whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other"). And exercising jurisdiction over Plaintiffs' claims "would not materially affect, or threaten to affect, the normal currents of litigation," *Grable*, 545 U.S. at 319, given the "rare" circumstances here: the federal government directing a select group of critical companies' operations to maintain the nation's food supply during a global pandemic unprecedented for perhaps over a century.

### III.   Defendants have satisfied the procedural requirements for removal.

Venue is proper in this district under 28 U.S.C. §§ 124(a) and 1441(a) because the United States District Court for the Northern District of Texas, Amarillo Division, embraces the county in which the state court action is now pending.

A civil cover sheet and a supplemental civil cover sheet are being filed concurrently with this Notice of Removal. LR 81.1(1), (2).

An index of all documents that clearly identifies each document and indicates the date the document was filed in state court, a copy of the docket sheet in the state court action, and each document filed in the state court action are attached hereto as **Exhibit A**. LR 81.1(4); 28 U.S.C. § 1446(a).

A separately signed certificate of interested persons that complies with Local Rule 3.1(c) is attached hereto as **Exhibit B**. LR 81.1(4)(D).

Defendants will promptly provide written notice of this filing to all adverse parties and will file a copy of this Joint Notice of Removal with the clerk of the state court where this suit has been pending. 28 U.S.C. § 1446(d).

## CONCLUSION

For the foregoing reasons, Defendants respectfully remove the matter styled "*Jamie Wazelle, et al. v. Tyson Foods, Inc., et al.,*" Cause No. 109874-C-CV, from the 251st Judicial District Court of Panola County, Texas, to the United States District Court for the Northern District of Texas.

Dated:  August 28, 2020                     Respectfully submitted,


                                            */s/ Kelly Utsinger*
                                            **UNDERWOOD LAW FIRM, P.C.**
                                            Kelly Utsinger
                                            Kelly.Utsinger@uwlaw.com
                                            Texas Bar No. 20416500
                                            C. Jason Fenton
                                            Texas Bar No. 24087505
                                            Jason.Fenton@uwlaw.com
                                            Titiana D. Frausto
                                            Texas Bar No. 24071614
                                            Titiana.Frausto@uwlaw.com
                                            500 S. Taylor, Suite 1200
                                            Amarillo, Texas 79101
                                            Telephone:  806.376.5613
                                            Facsimile:   806.379.0316


                                            Christopher S. Coleman
                                            **PERKINS COIE LLP**
                                            *Pro Hac Vice Application Forthcoming*
                                            2901 North Central Avenue
                                            Suite 2000
                                            Phoenix, Arizona 85012-2788
                                            Telephone:  602.351.8000
                                            Facsimile:   602.648.700
                                            CColeman@perkinscoie.com


                                            Mary Z. Gaston
                                            **PERKINS COIE LLP**
                                            *Pro Hac Vice Application Forthcoming*
                                            1201 Third Avenue. Suite 4900
                                            Seattle, Washington 98101
                                            Telephone:  206.359.8000
                                            Facsimile:   206.359.9000
                                            MGaston@perkinscoie.com


                                            **ATTORNEYS FOR DEFENDANTS**

-16-

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served upon all counsel of record, via First Class U.S. Mail and through the Court's CM/ECF system, on August 28, 2020, as follows:

Kurt Arnold
Caj Boatright
Roland Christensen
Joseph McGowin
Claire Traver
6009 Memorial Drive
Houston, Texas 77007
karnold@arnolditkin.com
cboatright@arnolditkin.com
rchristensen@arnolditkin.com
jmcgowin@arnolditkin.com
ctraver@arnolditkin.com
kbateam@arnolditin.com
e-service@arnolditkin.com

Tim Newsom
**YOUNG & NEWSOM, PC**
1001 S. Harrison
Suite 200
Amarillo, Texas 79101
tim@youngfirm.com

**ATTORNEYS FOR PLAINTIFFS**

*/s/ Kelly Utsinger*